**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERIMED EMERGENCY MEDICAL SERVICES LLC, | ) | Case No. 26-20894-jrs |
| | ) | |
| | ) | |
| Debtor. | ) | |

**NOTICE OF FILING OF ASSET PURCHASE AGREEMENT**

**PLEASE TAKE NOTICE** that Amerimed Emergency Medical Services, LLC (the "Debtor") has filed the Bankruptcy Asset Purchase Agreement (the "APA") which is attached hereto as Exhibit "A." The APA constitutes Exhibit "B" to the *Motion to Sell Property Free and Clear of Liens and Other Interests and to Assign Contracts and Leases Pursuant to 11 U.S.C. §§ 363 and 365* [Doc. No. 169] which the Debtor filed with the Court on November 22, 2026.

Respectfully submitted this 25th day of November, 2026.

**SMALL HERRIN, LLP**
Co-Counsel for Debtor

By: /s/ Benjamin S. Klehr
Benjamin S. Klehr
Georgia Bar No. 487931

100 Galleria Parkway, Suite 350
Atlanta, GA 30339
(P) 770-783-1800
gsmall@smallherrin.com
ahumnicky@smallherrin.com
bklehr@smallherrin.com

# EXHIBIT "A"

# BANKRUPTCY ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is entered into as of November 24, 2026 (the "**Execution Date**"), by and between AMERIMED EMERGENCY MEDICAL SERVICES LLC, a Georgia limited liability company, as debtor and debtor-in-possession (the "**Seller**" or "**Debtor**"), and MEDEX MEDICAL TRANSPORT SERVICE, INC., a North Carolina corporation, or its assignee (the "**Buyer**"), subject to approval by the United States Bankruptcy Court for the Northern District of Georgia ("**Bankruptcy Court**"). Seller and Buyer are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

A. Seller operates an ambulance and medical transportation business, including dispatch operations located at 4908 Golden Parkway, Suite 100, Buford, GA 30518 and 5012 Bristol Industrial Way, Suite 109, 110 & 111, Buford, GA 30518 (the "**Business**").

B. Seller is the debtor-in-possession in that certain bankruptcy case under Chapter 11 of the Bankruptcy Code, Case Number 26-20894-jrs (the "**Bankruptcy Case**" or "**Chapter 11 Case**") in the Bankruptcy Court.

C. Subject to the Bankruptcy Court's approval, Seller desires to sell certain of its assets used in connection with its medical transportation operations, consisting of the Acquired Assets (as defined below), pursuant to Sections 363 and 365 of the Bankruptcy Code.

D. Buyer is engaged in the ambulance and medical transportation business and desires to purchase the Acquired Assets.

E. Buyer and Seller have entered into that certain binding letter of intent dated November 17, 2026 (the "**Letter of Intent**"), setting forth the principal terms of the transaction contemplated by this Agreement.

## ARTICLE I
## DEFINITIONS

"**Acquired Assets**" or the "**Purchased Assets**" means all of Seller's right, title and interest in and to the following, other than Excluded Assets, together with all associated accessories, appurtenances, manuals, records, transferable warranties, passwords, administrative credentials, configurations, licenses, and rights held by Seller that are necessary or useful for Buyer's ownership, possession, use, operation, maintenance, or exploitation of the applicable Acquired Assets, except as expressly excluded in this Agreement:

(a) Amerimed Brand Assets. All of Seller's right, title, and interest in and to the name "Amerimed," including all variations, abbreviations, stylizations, trade dress, logos, service marks, trademarks, trade names, assumed names, domain names, internet addresses, social-media account names and handles, goodwill, advertising materials, promotional materials, brand standards, customer-facing templates, vehicle markings, uniforms, signage,

brand-related artwork, and all applications, registrations, renewals, common-law rights, and all legal, equitable, or other claims associated with any of the foregoing (collectively, the "**Amerimed Brand Assets**").

(b) Telecommunications Assets. All telecommunications systems and components used by Seller, including dispatch systems; telephone systems; voice-over-internet-protocol systems; private branch exchange systems; headsets; base-station radio equipment; repeaters; antennas; radio-frequency equipment; modems; televisions, routers; switches; firewalls; network cabling; telecommunications software; call-routing configurations; call recordings; call queues; subscriber accounts; carrier arrangements; and all transferable service contracts, leases, licenses, permits, user rights, and administrative credentials related thereto (collectively, the "**Telecommunications Assets**"); provided, however, that the Telecommunications Assets shall include only telecommunications equipment located at or installed at 4908 Golden Parkway, Suite 100, Buford, GA 30518 (the "**Headquarters**") and 5012 Bristol Industrial Way, Suites 109, 110 and 111, Buford, GA 30518 (the "**Dispatch Center**" and, collectively with the Headquarters, the "**Buford Locations**"), together with all telecommunications software, configurations, service contracts, and accounts used to operate such equipment (including all Toughbooks and tablets included as Physical Dispatch Hardware and Furniture), and shall not include any other telecommunications assets installed in vehicles.

(c) Telephone Number Assets. All local, toll-free, facsimile, and mobile telephone numbers used, published, or marketed by Seller, including those listed on **Exhibit A** hereto, all numbers used or marketed in connection with the Amerimed name, and all numbers used or previously used by hospitals, facilities, patients, or other customer or referral sources to request Seller's services, together with all rights to port or transfer such numbers to a carrier of Buyer's choosing or to another telephone number used by Buyer, all call-routing configurations associated with such numbers, all directory and online listings of such numbers, and the subscriber accounts and administrative credentials necessary to control and transfer such numbers (collectively, the "**Telephone Number Assets**").

(d) Contract Rights and Historical Data Assets. An assignment of Seller's rights, to the maximum extent transferable, in all of Seller's accounting systems, vendor software, or other platforms, together with all user accounts, user names and passwords, and data hosted on or associated with Seller's historical billing data, historical revenue, and all contract data, and all contracts with hospitals, medical providers, mental health providers, or any other customers, potential customers, referral sources, or potential referral sources, whether denominated as exclusive, preferred provider, or otherwise, including those listed on **Exhibit B** hereto (collectively, the "**Contract Rights and Historical Data Assets**"). For the avoidance of doubt, the Contract Rights and Historical Data Assets shall not include Seller's accounts receivable or the right to collect such accounts receivable.

(e) Traumasoft Contract. All of Seller's rights, title, and interest in, to, and under the Traumasoft Contract (the "**Traumasoft Contract**"), to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code; provided that any such assignment shall preserve Seller's access to Traumasoft for the purpose of collecting pre-

Closing accounts receivable for a period of six (6) months after Closing or until the end of the term of the Traumasoft Contract, whichever is earlier.

(f) Oracle NetSuite Contract. To the extent assignable, all of Seller's rights, title, and interest in, to, and under Seller's contract with Oracle for the NetSuite platform (the "**Oracle NetSuite Contract**"), under which Seller currently holds read-only access for a single user through April 8, 2027; provided that Seller may retain a copy of all NetSuite financial data through the completion of the wind-down of the Bankruptcy Case.

(g) Intangible Intellectual Property. All of Seller's intellectual-property rights not otherwise included in the Amerimed Brand Assets or the Contract Rights and Historical Data Assets, including patents, trademarks, and copyrights; rights in software, source code, object code, databases, data compilations, data models, interfaces, workflows, documentation, manuals, policies, protocols, training materials, know-how, trade secrets, proprietary processes, inventions, discoveries, designs, drawings, technical information, customer lists, supplier lists, marketing materials, websites, and digital content; and all claims and causes of action for infringement, misappropriation, or violation thereof, in each case to the extent transferable and owned by Seller (collectively, the "**Intangible Intellectual Property**").

(h) Physical Dispatch Hardware and Furniture. Only the infrastructure and equipment at the Buford Locations involved in Seller's dispatch, communications, and information-technology operations at either location, including telephone and communications systems and equipment, telephone lines, network and telecommunication wiring and cabling, network equipment (such as routers, switches, and firewalls), base-station radio equipment, antennas, repeaters, installed dispatch consoles, and the servers, server racks, storage devices, and related equipment in the IT data room, and all furniture, fixtures, and equipment located at or used in connection with Seller's dispatch facilities or dispatch operations and located at the Headquarters or the Dispatch Center, including desks, workstations, chairs, tables, conference furniture, filing cabinets, storage cabinets, shelving, lockers, whiteboards, televisions, wall displays, lighting, break-room equipment, security equipment, and other office, administrative, or operational furnishings and equipment (collectively, the "**Physical Dispatch Hardware and Furniture**"). For the avoidance of doubt, the Physical Dispatch Hardware and Furniture includes such assets whether or not installed at the Headquarters or the Dispatch Center, including all dispatch consoles purchased but not installed or used by Seller. The Physical Dispatch Hardware and Furniture shall not include any stretchers (both power and manual), stair chairs, load systems, or medical equipment; any vehicles (including ambulances, forklifts, golf carts, or bicycles); oxygen tanks; supplies (other than Expirable Medical Assets); or inventory, all of which are Excluded Assets and may be sold separately by Seller. Unless specifically assumed by Buyer, any Physical Dispatch Hardware and Furniture and any other physical assets leased by or rented to Seller shall also be Excluded Assets.

(i) Expirable Medical Assets. All of the following owned by Seller and located at the Headquarters or the Dispatch Center: bandages, dressings, sheets, gauze pads, soft roller bandages, adhesive tape, tourniquets, bandage shears, sphygmomanometers,

stethoscopes, glucose monitoring instruments, strips, lancets, alcohol preps, pulse oximetry devices, thermometers and all covers, extremity immobilization devices, short spinal extraction devices, pediatric immobilization devices, lateral cervical immobilization devices, cervical immobilization collars, traction splints, spring-loaded center punches, gloves, mattress covers, pillows, blankets, waterproof patient covers, emesis basins and emesis bags, restraints, urinals, bedpans, surgical face masks, infant insulating devices, obstetrical kits, flashlights, sharps containers, and personal protection equipment (collectively, the "**Expirable Medical Assets**").

(j) Headquarters Lease. All of Seller's rights, title, and interest as tenant in, to, and under Seller's lease of the Headquarters with Datamaha, LLC, as landlord, having a term through November 30, 2027 (the "**Headquarters Lease**"), which Seller shall seek to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code; provided, however, that Buyer may, by written notice delivered to Seller at any time prior to the hearing on the Approval Motion (the "**Sale Hearing**"), remove the Headquarters Lease from the Acquired Assets, in which event the Headquarters Lease shall be an Excluded Asset.

For purposes of this Agreement, the "**Physical Assets**" shall consist of the Telecommunications Assets, the Physical Dispatch Hardware and Furniture, and the Expirable Medical Assets; the "**Intangible Assets**" shall consist of the Amerimed Brand Assets, the Telephone Number Assets, the Contract Rights and Historical Data Assets, the Intangible Intellectual Property, and the Headquarters Lease; and the Acquired Assets shall include the Physical Assets and the Intangible Assets. The Traumasoft Contract, the Oracle NetSuite Contract, the Headquarters Lease (unless removed as provided above), and the contracts with hospitals, medical providers, mental health providers, customers, and referral sources included in the Contract Rights and Historical Data Assets, each as listed on **Exhibit A** hereto, are collectively referred to as the "**Assumed Contracts**."

"**Assumed Liabilities**" means only those liabilities expressly assumed under Section 3.1.

"**Bankruptcy Code**" means Title 11 of the United States Code. All references to Sections that do not specifically reference the Bankruptcy Code are deemed to be referring to such section under the Bankruptcy Code.

"**Buford Locations**" means, collectively, the Headquarters and the Dispatch Center.

"**Cure Costs**" means amounts required to cure defaults under assigned executory contracts as such amounts may be agreed upon by the counterparties or determined by the Bankruptcy Court.

"**Deposit**" means forty-five thousand dollars ($45,000.00) to be deposited by Buyer with Seller's counsel within three (3) business days after the Execution Date (or, to the extent already deposited pursuant to the Letter of Intent, the amount so deposited), to be held and disbursed in accordance with this Agreement and applicable orders of the Bankruptcy Court.

"**Dispatch Center**" means Seller's facility located at 5012 Bristol Industrial Way, Suites 109, 110 and 111, Buford, Georgia 30518.

"**Effective Date**" means the date that is fifteen (15) days after the Bankruptcy Court enters the Sale Order, so long as (i) any appeal that has been taken has been finally determined or dismissed, or (ii) the time for appeal has expired and no appeal has been filed timely, or a date otherwise agreed to by the Parties.

"**Excluded Asset**" means (1) all cash and bank accounts of Seller; (2) all accounts receivable of Seller and the right to collect the same; (3) all vehicles (including ambulances, forklifts, golf carts and bicycles), stretchers (power and manual), stair chairs, load systems, medical equipment, oxygen tanks, supplies (other than Expirable Medical Assets) and inventory; (4) all telecommunications assets installed in vehicles; (5) all Physical Dispatch Hardware and other physical assets leased by or rented to Seller that are not specifically assumed and assigned to Buyer hereunder; (6) the Headquarters Lease, if Buyer removes the Headquarters Lease from the Acquired Assets by written notice to Seller on or before the date of the Sale Hearing; (7) the corporate seals, minute books, tax returns, books of account and other records having to do with the organization of Seller, (8) any and all real property owned by Seller, and (9) any assets not expressly listed as an Acquired Asset.

"**Excluded Liabilities**" means all liabilities not expressly assumed, including all prepetition claims.

"**Headquarters**" means Seller's facility located at 4908 Golden Parkway, Suite 100, Buford, Georgia 30518.

"**Headquarters Lease**" means Seller's lease of the Headquarters with Datamaha, LLC, having a term through November 30, 2027, which Seller shall seek to assume and assign to Buyer unless Buyer, by written notice to Seller delivered on or before the date of the Sale Hearing, removes the Headquarters Lease from the Acquired Assets.

"**Letter of Intent**" means that certain binding letter of intent dated November 17, 2026, between Buyer and Seller regarding the proposed purchase of the Acquired Assets.

"**Marlow**" means Arthur Dixon Marlow II, the Chief Executive Officer of Seller.

"**Oracle NetSuite Contract**" means Seller's contract with Oracle for the NetSuite platform, through and including April 8, 2027, to the extent such contract is assignable.

"**Sale Hearing**" means the hearing before the Bankruptcy Court on the motion seeking approval of this Agreement and entry of the Sale Order.

"**Sale Order**" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, authorizing and approving the sale of the Acquired Assets to Buyer under §§363 and 365 of the Bankruptcy Code free and clear of all liens, claims, interests, encumbrances, successor liabilities and other interests, with all such interests attaching to the proceeds of such sale to the extent provided in such order.

"**Traumasoft Contract**" means the Traumasoft Contract, together with all of Seller's rights, title and interest thereunder, to be assumed by Seller and assigned to Buyer pursuant to this Agreement and the Sale Order.

## ARTICLE II
## PURCHASE AND SALE

2.1 **Transfer of Assets.** At Closing, pursuant to §§363 and 365, in accordance with the terms and conditions set forth in this Agreement, Buyer shall purchase and acquire from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all rights, title and interest in and to the Acquired Assets.

2.2 **Free and Clear.** The Acquired Assets shall be transferred free and clear of all liens, claims, interests, encumbrances, successor liabilities, and other interests, under §363(f), to the fullest extent authorized by the Bankruptcy Code and applicable law, except the Assumed Liabilities, with all such liens, claims, interests, encumbrances, successor liabilities, and other interests attaching to the proceeds of the sale to the extent provided in the Sale Order.

2.3 **Good Faith Purchaser.** The Sale Order shall include customary findings that Buyer is a good-faith purchaser for value entitled to §363(m) protections.

2.4 **No Successor Liability.** Buyer shall not assume any liabilities except Assumed Liabilities and shall not be deemed a successor under any theory, including de facto merger, continuation, or similar doctrines.

## ARTICLE III
## LIABILITIES

3.1 **Assumed Liabilities.** Buyer shall assume only the following Assumed Liabilities:

(a) <u>Headquarters Lease</u>. If the Headquarters Lease is assumed by Seller and assigned to Buyer pursuant to the Sale Order, all rent and other obligations under the Headquarters Lease first arising on and after November 30, 2026; provided, however, that Seller shall remain responsible for all rent and other obligations under the Headquarters Lease arising before November 30, 2026.

(b) <u>Traumasoft Contract</u>. All Cure Costs associated with the assumption by Seller and assignment to Buyer of the Traumasoft Contract, and all fees, price increases and other obligations under the Traumasoft Contract first arising after November 30, 2026; provided, however, that Seller shall pay all costs under the Traumasoft Contract coming due prior to November 30, 2026. Notwithstanding anything to the contrary contained in this Agreement or any document delivered in connection herewith, Buyer's obligations in respect of the Traumasoft Contract will not extend beyond the extent to which Seller was obligated in respect thereof and will be subject to Buyer's right to contest in good faith the nature and extent of any liability or obligation.

(c) Oracle NetSuite Contract. To the extent the Oracle NetSuite Contract is assignable and is assigned to Buyer, all liabilities and obligations under the Oracle NetSuite Contract first arising after November 30, 2026. Notwithstanding anything to the contrary contained in this Agreement or any document delivered in connection herewith, Buyer's obligations in respect of the Oracle NetSuite Contract will not extend beyond the extent to which Seller was obligated in respect thereof and will be subject to Buyer's right to contest in good faith the nature and extent of any liability or obligation.

(d) Hired Employees and Independent Contractors. The wages, taxes, benefits and other payments owed to those employees and independent contractors of Seller whom Buyer hires or retains after the Closing, solely to the extent arising after the Closing; in no event shall Buyer be responsible for any payments or non-monetary obligations to Seller's employees or independent contractors arising before or on the Closing.

3.2 **Excluded Liabilities**

Other than these Assumed Liabilities, Buyer shall not assume or become obligated to perform, without limitation, any liabilities or obligations of Seller, whether known or unknown, relating to the ownership or operation of the Business or the conduct of Seller prior to the Closing Date or any liabilities or obligations of Seller relating to events occurring or existing prior to the Closing Date or which result from or arise out of any action or inaction prior to the Closing Date of Seller, including all prepetition claims. Such liabilities that Buyer does not assume include, but are not limited to, the following:

(a) any liabilities, debts, obligations, claims, taxes, employee obligations (including all wages, taxes, benefits and severance obligations owed to Seller's employees and independent contractors through and including the Closing), contracts, accounts payable, any claims resulting from asserted fraud, waste, or abuse, patient-care obligations (including but not limited to any claims by any patient or payor against Seller for improper billing, improper payments, or improper care), litigation claims, and all costs under the Traumasoft Contract and the Oracle NetSuite Contract coming due prior to November 30, 2026, in each case whether known or unknown, fixed or contingent, matured or unmatured, and whether arising before, on or after November 30, 2026, other than the Assumed Liabilities;

(b) any liability, claim or obligation to any creditors, lenders, customers, contractors, vendors, suppliers or any others with whom Seller has a business relationship with and their respective successors and assigns;

(c) any liability based on alleged tortious or illegal conduct, regardless of when made or asserted, which arises out of or is based upon any representation, warranty, agreement or guarantee made by Seller, or alleged to have been made by Seller, or which is imposed or asserted to be imposed by operation of law, in connection with any business conducted by Seller;

(d) any liability or obligation with respect to, or in connection with the Excluded Assets;

(e) all taxes of Seller (whether relating to periods before or after the transactions contemplated in this Agreement or incurred by Seller in connection with this Agreement and the transactions provided for herein), and any liability pursuant to a tax allocation agreement or otherwise for taxes arising out of the inclusion of Seller in any group filing consolidated, combined or unitary tax returns or arising out of any transferee or successor liability;

(f) any severance obligations or other costs of terminating employees wherever located resulting from any termination or cessation (or deemed termination or cessation) of employment occurring on or prior to the Closing Date (including, but not limited to, any such termination or cessation occurring in connection with the transactions contemplated by this Agreement), from whatever source such obligations and costs arise, including, without limitation, contractual obligations, notices to employees, employment manuals, course of dealings, past practices, or obligations mandated by law, or otherwise;

(g) any and all liabilities or obligations of, or claims against, Seller, the Business and/or the Acquired Assets arising or existing on or prior to the Closing Date, whether or not such liabilities, claims or obligations have been discharged by the Bankruptcy Court;

(h) any and all liabilities or obligations arising under any tort theory against Seller or the Business; and

(i) any and all liabilities or obligations arising under any environmental law or legal requirement relating to pollution or protection of the environment, human health or safety (including ambient air, surface water, ground water, land surface or subsurface strata), including any law or regulation relating to emissions, discharges or releases of chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products or otherwise relating to the manufacture, processing, distribution, importation, use, treatment, storage, disposal, transport or handling of chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products.

## ARTICLE IV
## PURCHASE PRICE

### 4.1 Purchase Price

(a) The purchase price (the "**Purchase Price**") for the Acquired Assets shall be Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00). At Closing, Buyer shall pay the balance of the Purchase Price, less the Deposit and any credits expressly provided herein, by wire transfer of immediately available funds.

**4.2 Deposit**. By November 24, 2026, Buyer shall tender the Deposit of $45,000.00 to

Seller's counsel, to be held and disbursed as provided herein or pursuant to further order of the Bankruptcy Court.

**4.3 Exclusivity; Further Bids; Right to Match**

(a) Exclusivity. Upon the execution of this Agreement by Seller, Seller shall cease marketing the Acquired Assets and shall not solicit or encourage other offers for the Acquired Assets. Seller may respond to an unsolicited offer for the Acquired Assets made prior to the Sale Hearing and that is with the same material terms as this Agreement, and may negotiate regarding an unsolicited offer for all or substantially all of the Acquired Assets that Seller believes in good faith is materially better for the bankruptcy estate than the transaction contemplated by this Agreement (a "**Superior Offer**"). Nothing in this Agreement shall limit Seller in exercising its fiduciary obligations to respond to unsolicited offers for the Acquired Assets that Seller believes are materially better for the bankruptcy estate.

(b) Notice of Superior Offer. If Seller receives a Superior Offer that is with the same terms of this Agreement and believes that it is obligated to accept such Superior Offer instead of the transaction contemplated by this Agreement, Seller shall provide Buyer written notice of such Superior Offer, including its material terms, within two (2) business days after Seller's receipt of such Superior Offer.

(c) Right to Match. If Buyer, within two (2) business days after receipt of such notice, matches such Superior Offer, Seller shall accept Buyer's matching offer and proceed with the transaction contemplated by this Agreement, as modified to reflect such matching offer, subject to any further higher and better offers. All such further offers shall be subject to this Section 4.3, and Buyer shall retain the right to match any and all offers for all or substantially all of the Acquired Assets.

## ARTICLE V
## BANKRUPTCY PROCESS

5.1 **Agreement Contingent on Bankruptcy Court Approval**. The Parties hereby acknowledge that this Agreement is subject to approval by the Bankruptcy Court and that receipt of the Sale Order shall be a condition precedent to Closing for all Parties hereunder.

5.2 **Bankruptcy Court Approval**. Seller shall promptly file with the Bankruptcy Court a necessary pleading seeking approval of this Agreement and the sale of the Acquired Assets to Buyer on the earliest possible date (the "**Approval Motion**").

5.3 **Sale Order**. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery, and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to the Buyer on the terms set forth herein and free and clear of all liens, claims, interests, encumbrances, and successor liabilities, with all such interests attaching to the proceeds of the sale to the extent provided in the Sale Order, and (iii) the performance by Seller of its obligations under this Agreement; (b) find that the Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and not a successor to Seller, and grant the Buyer the protections of section 363(m) of the Bankruptcy Code; (c) authorize and approve, pursuant to section 365 of the Bankruptcy Code, the assumption by Seller and assignment to Buyer of the Traumasoft Contract, the Oracle NetSuite Contract (to the extent assignable) and, unless removed by Buyer in accordance with this Agreement, the Headquarters Lease; and (d) authorize the transfer to Buyer of all telephone numbers, domain names, accounts, and registrations included in the Acquired Assets.

## ARTICLE VI
## EXECUTORY CONTRACTS

6.1 **Traumasoft Contract**. Seller shall assign to Buyer all of Seller's rights, title and interest in and to the Traumasoft Contract. From the date of the Letter of Intent, Buyer may, but is not required to, negotiate with Traumasoft regarding a transfer of the Traumasoft Contract. Seller shall pay all costs under the Traumasoft Contract coming due prior to Closing. Buyer shall pay any Cure Costs associated with the assumption and assignment of the Traumasoft Contract, and any post-November 30, 2026 fees or price increases under the Traumasoft Contract shall be Buyer's responsibility. Any transfer of the Traumasoft Contract to Buyer shall preserve Seller's access to Traumasoft for the purpose of collecting Seller's pre-Closing accounts receivable for a period ending on the earlier of (i) eighteen (18) months after the Closing Date or (ii) the expiration or termination of the Traumasoft Contract. If, during such period, Buyer determines not to renew the Traumasoft Contract, Buyer shall give Seller not less than thirty (30) days notice of the non-renewal and Buyer shall give Seller reasonable access to Traumasoft to retain pre-Closing records. All costs incurred in Seller's retention of pre-Closing records upon Buyer's termination or non-renewal of the Traumasoft contracts shall by borne by Seller.

6.2 **Oracle NetSuite Contract**. To the extent assignable, Seller shall assign to Buyer all of Seller's rights, title and interest in and to the Oracle NetSuite Contract. Seller currently holds read-only access for a single user for a term of six (6) months, through April 8, 2027. Buyer may, but is not required to, negotiate with Oracle regarding a transfer of the Oracle NetSuite Contract. Seller shall pay all costs under the Oracle NetSuite Contract coming due prior to November 30, 2026. Prior to filing the Approval Motion, Seller shall provide Buyer a full download of all NetSuite financial data. Seller shall have reasonable access to such NetSuite financial data, during normal business hours and upon reasonable advance notice, as reasonably necessary for preparing its tax returns and other related filings and as necessary to complete its winddown in the Bankruptcy Case. Seller may retain a copy of such NetSuite financial data through the completion of the winddown process in the Bankruptcy Case.

6.3 **Headquarters Lease**. Seller shall seek to assume and assign to Buyer the Headquarters Lease, unless Buyer directs Seller in writing that it no longer desires to receive an assignment of

the Headquarters Lease. Buyer shall have until the Sale Hearing to remove the Headquarters Lease from the Acquired Assets. Seller shall be responsible for all rent and other obligations under the Headquarters Lease accruing prior to November 30, 2026, and Buyer shall be responsible for all rent and other obligations under the Headquarters Lease accruing on and after November 30, 2026. Buyer shall reasonably cooperate with the landlord and Seller to provide such information as the landlord may reasonably require regarding Buyer's ability to perform under the Headquarters Lease, including adequate assurance of future performance under §365(f)(2)(B).

## ARTICLE VII
## REPRESENTATIONS

As a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, Seller hereby represents and warrants to Buyer as follows:

7.1 **Corporate Status**. Seller is a duly organized, validly existing limited liability company in good standing under the laws of the State of Georgia.

7.2 **Authority**. Except for Bankruptcy Court approval, Seller has full right, power and authority to enter into this Agreement and to perform its obligations hereunder. This Agreement constitutes a valid agreement, binding upon and enforceable against Seller in accordance with its terms. All acts or proceedings required to be taken by Seller to authorize the execution and delivery of this Agreement and the performance of Seller obligation hereunder have been properly taken and will be taken as authorized by the Bankruptcy Court in accordance with the Sale Order.

7.3 **Conflicts; Consents.**

(a) Assuming that requisite Bankruptcy Court approvals are obtained, and all necessary notices, authorizations, approvals, Orders, permits, or consents are made, given, or obtained (as applicable), the execution, delivery, and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of either Seller; (ii) violate any law applicable to either Seller or by which any property or asset of either Seller is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of either Seller under, any material Contract.

(b) Neither Seller is required to file, seek, or obtain any notice, authorization, approval, Order, permit, or consent of or with any governmental body in connection with the execution, delivery and performance by such Seller of this Agreement or the consummation by such Seller of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Acquired Assets taken as a whole, or (iii) as may be necessary as a result of any facts or circumstances relating to Buyer.

7.4 **Title to Acquired Assets**. Subject to requisite Bankruptcy Court approvals and except as a result of the commencement of the Bankruptcy Case, Seller owns good and marketable title to the Acquired Assets.

7.5 **Permits; Compliance with Laws**. Seller is in compliance, in all material respects, with all applicable laws with respect to the ownership and operation of the Acquired Assets, and during the prior two (2) years Seller have not received any written notice of any action or proceeding against it alleging any failure to comply in any material respect with any such laws, other than notices from the Internal Revenue Service and state tax authorities regarding alleged past due taxes. No investigation by any governmental body with respect to the Acquired Assets is pending or, to Seller's knowledge, threatened, and during the prior two (2) years Seller have not received any written notice of any such investigation.

7.6 **No Broker**. Seller has not contracted with, or made any promise to, any broker, finder, agent or other party for the payment of any fee or commission with respect to the transactions contemplated by this Agreement.

7.7 **No Additional Representations**. Except for the representations and warranties made by Seller in this Agreement, neither Seller nor any other Person make any express or implied representation or warranty with respect to Seller, the Business, assets, operations, liabilities, condition (financial or otherwise) or prospects, and Seller hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made by Seller in this Agreement, neither Seller nor any other Person makes or has made any representation or warranty to Buyer or any of its respective Representatives, with respect to, nor has Buyer or any of its respective Representatives relied on, (i) any financial projection, forecast, estimate, budget or prospective information relating to Seller or the Business or (ii) any oral or written information furnished or made available to Buyer or any of its Representatives in the course of its due diligence investigation of Seller and the Business, the negotiation of this Agreement or the consummation of the Transactions, including the accuracy, completeness or currency thereof, and neither Seller nor any other Person will have any liability to Buyer or any other Person in respect of such information, including any subsequent use of such information.

7.8 **"As Is" Transaction**. Buyer hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets including expenses to be incurred in connection with the Acquired Assets, the physical condition of any real or personal property comprising a part of the Acquired Assets or which is the subject of any other lease or other contract to be assumed by buyer at the Closing, the environmental condition or other matter relating to the physical condition of any real property or improvements, the zoning of any such real property or improvements, the value of the Acquired Assets (or any portion thereof), the transferability of property constituting the Acquired Assets, the terms, amount, validity or enforceability of any assumed liabilities, the merchantability or fitness of the personal property or any other portion of the Acquired Assets for any particular purpose, or any other matter or thing relating to the Acquired Assets or any portion thereof. Without in any way limiting the foregoing, Seller hereby disclaims any warranty, express or implied, of

merchantability or fitness for any particular purpose as to any portion of the Acquired Assets. Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of such other matters relating to or affecting the Acquired Assets as Buyer deemed necessary or appropriate and Buyer in proceeding with its acquisition of the Acquired Assets, except for any representations and warranties expressly set forth in this Agreement, is doing so based solely upon such independent inspections and investigations. Accordingly, Buyer will accept, at its option, the Acquired Assets at the Closing "As Is," "Where Is," and "With All Faults."

As a material inducement for Seller to enter into and perform its obligations under this Agreement, Buyer hereby represents and warrants to the Seller as follows:

7.9 **Corporate Status**. The Buyer is a duly organized, validly existing and in good standing corporation under the laws of the State of North Carolina.

7.10 **Authority for Agreement**. The Buyer has full right, power and authority to enter into this Agreement and to perform its obligations hereunder. This Agreement constitutes a valid agreement, binding upon and enforceable against Buyer in accordance with its terms.

7.11 **Funding.** The Buyer has, or will have prior to the Closing Date, sufficient funds in an aggregate amount necessary to pay the balance of the Purchase Price, to perform and satisfy the Assumed Liabilities as such Assumed Liabilities come due, and to consummate all of the other transactions contemplated by this Agreement, including the payment of all fees, expenses and other amounts required to be paid by Buyer in connection with the transactions contemplated by this Agreement. In no event shall the receipt or availability of any funds or financing by the Buyer or any other financing or other transactions be a condition to the Buyer's obligations hereunder.

7.12 **No Broker**. Buyer has not contracted with, or made any promise to, any broker, finder, agent or other party for the payment of any fee or commission with respect to the transactions contemplated by this Agreement.

## ARTICLE VIII
## COVENANTS

8.1 **Seller Covenants**. From and after the Execution Date, Seller agrees as follows.

(a) Preservation of Acquired Assets. Seller shall preserve the Acquired Assets in substantially their current condition, ordinary wear and tear excepted, and shall not sell, transfer, remove, damage, or otherwise dispose of any Acquired Asset without Buyer's prior written consent.

(b) Continuation of Insurance. Seller shall maintain insurance on all Acquired Assets at all times until the Closing Date.

(c) Access and Diligence. Seller shall provide Buyer and its representatives reasonable access, during normal business hours and upon reasonable advance notice, but in all events at the

earliest possible opportunity, to the Acquired Assets, Seller's facilities, personnel with knowledge of the Acquired Assets, and books and records concerning the Acquired Assets, and shall reasonably cooperate at the earliest possible opportunity with Buyer's efforts to verify the ownership, condition, location, and transferability of the Acquired Assets; provided, however, that Buyer's diligence activities shall not unreasonably interfere with Seller's ongoing operations or the administration of the Bankruptcy Case.

(d) Pre-Closing Software Costs. Seller shall pay all costs under the Traumasoft Contract and the Oracle NetSuite Contract coming due prior to November 30, 2026.

(e) Cooperation for Acquired Assets. For one hundred twenty (120) days after the Closing Date, Seller shall give Buyer, its agents and contractors, reasonable access to the dispatch facility located at 5012 Bristol Industrial Way, Suite 109, 110, and 111, Buford, Georgia 30518, during normal business hours and upon reasonable advance notice to inventory and remove any of the Acquired Assets. During such term, Seller shall allow the Acquired Assets to remain at the dispatch facility without charge and shall not use, remove, or dispose of the Acquired Assets. Seller and Buyer shall work with each other to transport both the Excluded Assets and Acquired Assets to their respective owners' business locations.

(f) Employee Transition. Buyer shall have the right to contact Seller's employees and independent contractors for the purpose of discussing their employment or engagement by Buyer following Closing. Buyer shall have the absolute right, in its sole and absolute discretion, to determine which of Seller's employees and independent contractors, if any, it wishes to employ or engage after Closing and at what compensation, and Buyer may, but is not required to, extend written offers of employment to such individuals before Closing. At least five (5) business days before Closing, Buyer shall provide Seller a list of the employees and independent contractors who have received and accepted an offer of employment with Buyer. On the Closing Date, Seller shall terminate the employment or engagement of all other employees and independent contractors of Seller, other than those Seller deems necessary to complete the winddown of the Bankruptcy Case. Seller shall be responsible for all wages, taxes, and benefits for all employees and independent contractors through and including the Closing Date. Notwithstanding anything in this Agreement to the contrary, Buyer shall be responsible only for the wages, taxes, benefits, and other payments for employees and independent contractors it hires or retains after Closing and only for such wages, taxes, benefits, and other payments arising or accruing after Closing, and in no event shall Buyer be responsible for any payments or non-monetary obligations to Seller's employees or independent contractors arising before or on the Closing Date. Unless agreed to otherwise in writing by the Buyer and the applicable employee or independent contractor, all transferred employees or independent contractors shall be "at-will."

(g) **Post-Closing Cooperation**. Seller will assist Buyer in transferring payment direction for any post-Closing accounts receivables generated by Buyer and will promptly forward to Buyer any payments, mail, or inquiries Seller receives relating to Buyer's accounts receivables. Upon request by Buyer, Seller will also provide any additional user names, passwords,

administrative credentials and access, porting authorizations, letters of authorization, domain-transfer authorizations, and the like, as well as all associated accessories, appurtenances, manuals, records, or transferable warranties, all as required to put Buyer in full possession and use of the Acquired Assets. Such covenant shall survive until fully performed in compliance with this Agreement.

8.2 **Buyer Covenants**. From and after the Execution Date, Buyer agrees as follows.

(a) Landlord Cooperation. Buyer shall reasonably cooperate with the landlord under the Headquarters Lease and with Seller to provide such information as the landlord may reasonably require regarding Buyer's ability to perform under the Headquarters Lease.

(b) Headquarters Access. If Buyer takes an assignment of the Headquarters Lease, for one hundred twenty (120) days after the Closing Date, Buyer shall give Seller, its auctioneer, appraisers, agents and contractors, and purchasers of Excluded Assets reasonable access to Headquarters, during normal business hours and upon reasonable advance notice to inventory, photograph, appraise, market, preview, sell, and to remove any of the Excluded Assets. During such term, Buyer shall allow the Excluded Assets to remain at Headquarters without charge and shall not use, remove, or dispose of the Excluded Assets. During such term, Buyer shall reasonably cooperate in facilitating a staging area for auction preview and buyer pick up. Such access shall not interfere with Buyer's business operations. If such access does interfere with Buyer's business operations, Buyer may notify Seller, and the parties shall take good faith steps to address such interferences, which may include termination of such access as may be reasonably necessary. If Buyer has taken an assignment of the Headquarters Lease, on or before one hundred twenty (120) days after the Closing Date, Seller shall remove all Excluded Assets from the Headquarters. If Seller does not remove any portion of physical Excluded Assets by such deadline, such physical Excluded Assets shall be property of Buyer on the one hundred twentieth day after Closing Date

(c) Winddown Access and Post-Closing Cooperation. From the Closing Date until the earlier of (x) six (6) months after the Closing Date or (y) the closing of the Bankruptcy Case, Buyer shall provide Seller reasonable access to the Acquired Assets solely for purposes of Seller's winddown of the Bankruptcy Case (including collecting accounts receivable, filing operating reports and tax returns, responding to the Internal Revenue Service and the United States Trustee, and resolving pending litigation), as follows: (i) Buyer grants Seller a limited, royalty-free license to use the "Amerimed" name solely for such winddown purposes; (ii) Buyer shall give Seller and its advisors reasonable access to, or copies of, the books, records, billing data, and systems included in the Acquired Assets for periods through the Closing Date (but not thereafter); (iii) to the extent Buyer maintains access to Traumasoft and Oracle NetSuite, Buyer shall provide Seller read-only access to such systems sufficient to bill and collect its accounts receivable and complete its accounting and reporting; and (iv) Buyer shall promptly forward to Seller any payments, mail, or inquiries it receives relating to Seller's accounts receivable.

8.3 **Post-Closing Cooperation**. From and after the Closing, Seller and Buyer shall

each provide the other reasonable cooperation in the transfer of the Acquired Assets to Buyer, including porting telephone numbers and transferring domain names, subscriber and user accounts, passwords, and administrative credentials.

8.4 **Confidentiality**. The existence and terms of this Agreement, all nonpublic information provided by either Party in connection with the transactions contemplated hereby, and all communications concerning such transactions shall be treated as confidential and shall not be disclosed to any third party except:

(a) to the Parties' respective attorneys, accountants, lenders, investors, insurers, consultants, and other representatives who have a need to know such information and are bound by confidentiality obligations;

(b) as required by applicable law, Bankruptcy Court order, or other legal process;

(c) as necessary in connection with filings, notices, pleadings, motions, or hearings in the Bankruptcy Case, including to the Internal Revenue Service or the United States Trustee; or

(d) with the prior written consent of the other Party.

8.5 **Term.** Notwithstanding the Closing, the covenants of Seller and Buyer set forth in this Article shall survive the Closing for a period of two years unless a different time is specified for a particular covenant.

## ARTICLE IX
## CLOSING

9.1 **Conditions of Seller's Obligation**. Seller's obligation to consummate the transactions contemplated by this Agreement is subject to satisfaction of the following conditions on or prior to the Closing Date:

(a) Buyer shall have, in all material respects, performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by Buyer prior to or on the Closing Date.

(b) The representations and warranties made by Buyer in Article VII above shall be true and correct as of the Closing Date, except where the failure of such representation and warranties to be true and correct would not reasonably be expected to have a material effect.

(c) The Bankruptcy Court shall have entered the Sale Order which shall not be subject to any stay, and such order shall be final and non-appealable or otherwise be effective in accordance with its terms, unless otherwise agreed by the Parties.

(d) Buyer shall have paid the Deposit when due in accordance with this Agreement.

9.2 **Conditions of Buyer's Obligation**. Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to satisfaction of the following conditions on or prior to the Closing Date:

(a) The Bankruptcy Court shall have entered the Sale Order which shall not be subject to any stay, and such order shall be final and non-appealable or otherwise be effective in accordance with its terms, unless otherwise agreed by the Parties.

(b) The representations and warranties made by Seller in Article VII above shall be true and correct as of the Closing Date, except where the failure of such representation and warranties to be true and correct would not reasonably be expected to have a material effect.

(c) The Acquired Assets shall be in substantially the same condition, and available for transfer to Buyer in substantially the same manner, as at the time of Buyer's inspection, ordinary wear and tear excepted.

(d) Seller shall have the authority to transfer the Acquired Assets pursuant to the Sale Order, and Buyer shall receive the Acquired Assets free and clear of all liens, claims, interests, and encumbrances as contemplated by this Agreement and the Sale Order.

(e) Seller shall have obtained, or the Sale Order shall authorize the transfer of, all material consents and approvals necessary to transfer the Acquired Assets and any assigned contracts, accounts, licenses, registrations, telephone numbers, domains, or other rights included in the Acquired Assets, including a final order of the Bankruptcy Court authorizing the assumption and assignment to Buyer of the Traumasoft Contract, to the extent such contract may be assigned, the Oracle NetSuite Contract, and, to the extent such lease is to be assigned, the Headquarters Lease.

(f) No order, injunction, or other restraint shall prohibit the transactions contemplated by this Agreement or materially impair Buyer's intended ownership or use of the Acquired Assets.

(g) Arthur Dixon Marlow II shall have executed and delivered to Buyer at Closing a mutually acceptable agreement (the "**Marlow Restrictive Covenant Agreement**"), pursuant to which he agrees (i) not to solicit Buyer's employees or customers, and (ii) not to compete with Buyer in the ambulance and medical transportation business. The execution of the Marlow Restrictive Covenant Agreement shall be a condition to close, but notwithstanding anything to the contrary herein or in the Marlow Restrictive Covenant Agreement, it shall not be a liability of Seller.

(h) All Parties agree that all of the Acquired Assets being sold by Seller are being sold as an inseparable package that must be approved as an inseverable whole, and the closing of the

sale on all of the Acquired Assets shall occur simultaneously.

9.3 **Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, and the consummation of the other transactions contemplated by this Agreement (the "**Closing**") will take place by telephone conference and electronic exchange of documents on the fifteenth day after the date the Bankruptcy Court enters the Sale Order, or at such time and date mutually agreed upon by Seller and Buyer (the "**Closing Date**"). But in no event shall the Closing Date be later than the thirtieth (30th) day following the date on which the Bankruptcy Court enters the Sale Order (so long as such Sale Order is a Final Order), subject to the conditions to closing set forth above.

9.4 **Closing Law Firm**. The law firm of Jones & Walden LLC or other such law firm as Buyer may select in its reasonable discretion (the "**Closing Firm**"), will be authorized to perform the Closing in consultation with bankruptcy counsel for Seller. Buyer will be solely responsible for payment of any fees or costs incurred by or related to the services provided by the Closing Firm.

9.5 **Closing Deliveries by Seller**. At or prior to Closing, Seller shall deliver to Buyer the following:

(a) a bill of sale and assignment and assumption agreement with respect to the Acquired Assets and Assumed Liabilities duly executed by Seller;

(b) an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller, certifying that the conditions set forth in Section 9.1 have been satisfied and that Seller's representations and warranties set forth in Article VII are true and correct as of the Closing Date.

(c) if the Headquarters Lease has not been removed from the Acquired Assets, an assignment and assumption of the Headquarters Lease duly executed by Seller, Datamaha, LLC, as landlord, and Amerimed Medical Solutions, LLC, an affiliate of Debtor;

(d) an assignment and assumption of the Oracle NetSuite Contract, to the extent assignable, duly executed by Seller;

(e) an assignment and assumption of the TraumaSoft Contract, duly executed by Seller;

(f) an assignment and assumption of all contracts included in the "Contract Rights and Historical Data Assets" duly executed by Seller.

(g) a copy of the Sale Order, as entered by the Bankruptcy Court;

(h) all user names, passwords, administrative credentials and access, porting authorizations, letters of authorization, and domain-transfer authorizations necessary to transfer control of the Telephone Number Assets, domain names, accounts, systems, and other Acquired Assets to Buyer;

(i) keys, access codes, passwords, and possession of Headquarters;

(j) Seller's interest in any existing manufacturer's warranties, service contracts, or repair guarantee and/or other similar warranties which, by their terms, may be transferrable to the Buyer;

(k) the Marlow Restrictive Covenant Agreement, duly executed by Arthur Dixon Marlow II;

(l) any further assurances as required pursuant to this Agreement.

9.6 **Closing Deliveries by Buyer**. At or prior to Closing, Buyer shall deliver to Seller the following:

(a) the Purchase Price, less the Deposit.

(b) an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer, certifying that the conditions set forth in Section 9.2 have been satisfied and that Buyer's representations and warranties set forth in Article VII are true and correct as of the Closing Date.

(c) if the Headquarters Lease has not been removed from the Acquired Assets, an assignment and assumption of the Headquarters Lease duly executed by Buyer;

(d) an assignment and assumption of the Oracle NetSuite Contract, to the extent assignable, duly executed by Buyer;

(e) an assignment and assumption of the TraumaSoft Contract, duly executed by Buyer;

(f) an assignment and assumption of all contracts included in the "Contract Rights and Historical Data Assets" duly executed by Buyer.

(g) any further assurances as required pursuant to this Agreement.

9.7 **Withholding**. Buyer shall not be entitled to deduct and withhold from the Purchase Price any amounts. Buyer and Seller shall cooperate in good faith to reduce or otherwise eliminate any such withholding obligation to the extent permitted by applicable law.

9.8 **Closing Costs**.

(a) Seller shall pay the fees of Seller's counsel and consultants and all other expenses incurred by Seller in connection with this Agreement.

(b) Buyer shall pay the fees of Buyer's counsel and consultants, any costs in connection with Buyer's inspection of the Acquired Assets, and all transfer taxes, if any.

9.9 **Tax Matters**.

(a) Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, registration, or other taxes and recording charges payable solely by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated hereby (the "**Transfer Taxes**") shall be borne and timely paid by the Buyer only to the extent not exempt under the Bankruptcy Code, as applicable to the transfer of the Purchased Assets pursuant to this Agreement, and the Buyer shall timely file all tax returns related to any Transfer Taxes. The Seller and the Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes, including pursuant to section 1146(a) of the Bankruptcy Code. Seller shall have no liability for any Transfer Taxes.

(b) The Buyer and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of tax returns and any action, audit, litigation, or other proceeding with respect to any Taxes.

(c) Except as specifically set forth in this Agreement, neither Party makes any representations regarding the implications of the transactions contemplated herein on any liability for any taxes to any governmental authority, and each Party shall be liable for any such taxes under applicable law.

9.10 **Termination of Agreement**. This Agreement may be terminated only in accordance with this Section. This Agreement may be terminated at any time prior to the Closing:

(a) by the mutual written consent of the Seller and the Buyer;

(b) by written notice from the Seller to the Buyer, upon a breach or failure of any covenant or agreement on the part of the Buyer after fifteen (15) days notice and opportunity to cure;

(c) by written notice from the Buyer to the Seller, upon a breach or failure of any covenant or agreement on the part of Seller after fifteen (15) days notice and opportunity to cure;

(d) by written notice from the Seller to the Buyer, if all of the conditions to closing have been satisfied or waived and the Buyer fails to complete the Closing by the Outside Date;

(e) by written notice from the Seller to the Buyer, if (i) the Buyer fails to pay the Deposit when due, or (ii) prior to the hearing on the Approval Motion, the Seller receives an unsolicited offer for all or substantially all of the Acquired Assets that the Seller believes, in the exercise of its fiduciary duties, is materially better for the bankruptcy estate than the transactions

contemplated by this Agreement and the Seller elects to accept such offer (which shall constitute an Alternative Transaction); provided, however, that the Seller shall have given the Buyer written notice of such offer within two (2) business days after its receipt and the Buyer shall not have matched such offer, it being agreed that if the Buyer matches such offer, the Seller shall accept the Buyer's offer and proceed under this Agreement, subject to further higher and better offers;

(f) by written notice from either the Seller or the Buyer to the other, if the Bankruptcy Court denies approval of, or otherwise fails to approve, the sale of the Acquired Assets to the Buyer pursuant to this Agreement; or

(g) by written notice from the Buyer to the Seller, if any of the conditions to the Buyer's obligations set forth in this Article IX has not been satisfied or waived by the Buyer on or before the Outside Date or becomes incapable of being satisfied.

9.11 **Effect of Termination**.

(a) In the event of termination of this Agreement, this Agreement shall become void and there shall be no liability on the part of any Party or any of its stakeholders, except as expressly provided in this Section with respect to the Deposit.

(b) If the Buyer fails to consummate the Closing despite approval of the sale by the Bankruptcy Court, or this Agreement has been terminated by the Seller due to the Buyer's breach of this Agreement, then the Seller shall be entitled to retain the Deposit as liquidated damages and as the Seller's sole and exclusive remedy against the Buyer. The Parties agree that the Seller's right to retain the Deposit is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Seller for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(c) In the event that (i) the Bankruptcy Court disapproves or fails to approve the sale of the Acquired Assets to the Buyer, or (ii) the Seller terminates this agreement in an exercise of its fiduciary duties in order to consummate an Alternative Transaction, the Buyer shall be entitled to the return of the Deposit, and Debtor's counsel shall return the Deposit to the Buyer within ten (10) business days of such disapproval or termination.

(d) If the Closing occurs, the Deposit shall be credited against the Purchase Price at Closing.

## ARTICLE X
## LIMITATION OF LIABILITY

10.1 This Agreement may only be enforced against, and any action based upon, arising out of or related to this Agreement may only be brought against, the entities that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no

past, present or future shareholder, member, partner, manager, director, officer, incorporator, employee, affiliate, agent, attorney, or advisor of any Party or any subsidiary of either the Seller or the Buyer will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the parties to this Agreement or for any action based upon, arising out of or related to this Agreement.

## ARTICLE XI
## HIPAA COMPLIANCE

11.1 **Patient Records**. Buyer acknowledges that as part of the transactions contemplated by this Agreement, Seller is assigning to Buyer data in TraumaSoft which includes billing and other patient records containing personally identifiable information and protected health information (the "Patient Records”). The assignment is necessary, in part, because Seller will no longer be able to fund the continued operation of TraumaSoft following the Closing Date. The Parties intend the transfer to preserve the Patient Records and ensure that Seller’s former patients can continue to access their information in accordance with all applicable laws, including HIPAA. Seller’s privacy policies permit disclosure to business associates that maintain the confidentiality of the information, and Buyer acknowledges that it operates an ambulance business and maintains confidential patient information in its own operations. At or before the Closing Date, the Parties shall execute and deliver the Business Associate Agreement attached hereto as Exhibit “__” (the “BAA”), which is incorporated herein by reference. In maintaining the Patient Records and responding to requests on Seller’s behalf, Buyer shall act as Seller’s business associate and shall keep the Patient Records confidential, maintain them in a secure, retrievable form for the applicable retention period, and handle them in accordance with the BAA, HIPAA, other applicable law, and Seller’s applicable privacy policies in effect on the Closing Date and furnished to Buyer at or before closing. Buyer shall maintain a designated point of contact for records requests and, upon a verified request from a former Seller patient or the patient’s authorized personal representative, shall timely provide that person directly with access to and, if requested, a copy of the Patient Records pertaining to that patient, in accordance with the BAA and 45 C.F.R. § 164.524 and other applicable law. Seller shall direct any such requests it receives after the Closing Date to Buyer, and Buyer shall respond within the applicable period measured from the date Seller or Buyer first received the request. Buyer’s obligations under this paragraph shall survive closing and any migration or replacement of TraumaSoft.

## ARTICLE XII
## MISCELLANEOUS

12.1 **Governing Law**

(a) This Agreement will be deemed to be a contract made under the laws of the State of Georgia and for all purposes will be governed by and interpreted in accordance with the laws prevailing in the State of Georgia without regard to principles of conflict of laws.

(b) This Agreement shall also be governed and interpreted by the provisions of the Bankruptcy Code.

12.2 **Jurisdiction.** The Bankruptcy Court shall have exclusive jurisdiction over any dispute arising from this Agreement, the Sale Order, and the transfer of the Acquired Assets. The Parties hereby agree that any Proceeding brought in connection with, or arising out of, any matter relating to this Agreement shall be brought in the Bankruptcy Court, and the Parties each irrevocably consent to the jurisdiction of such Court.

12.3 **Waiver of Jury Trial**. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER THIS AGREEEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

12.4 **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.

12.5 **Entire Agreement**. The terms and provisions of this Agreement constitute the entire agreement between the parties and there are no collateral agreements or representations. or warranties other than as expressly set forth or referred to in this Agreement. This Agreement supersedes any other agreement, whether written or oral, that may have been made or entered into by any party hereto or any of their respective Affiliates (or by any director, officer or representative hereof) relating to the matters contemplated hereby, including, without limitation the Letter of Intent dated November 18, 2026, between Buyer and Seller.

12.6 **Amendment and Waiver**. Any provision of this Agreement or exhibits hereto may be (a) amended only in a writing signed by Buyer and Seller or (b) waived only in a writing executed by the person against whom enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

12.7 **Further Assurances**. The Parties hereto shall execute and deliver such further instruments, documents and agreements as may be necessary or appropriate to carry out the terms

and provisions of this Agreement. In furtherance of the above, Seller will execute and deliver to Buyer such instruments of sale, transfer, conveyance, assignment and delivery, consents, assurances, powers of attorney and other similar instruments, and take such other actions as shall be necessary or otherwise be reasonably requested by Buyer or its counsel in order to vest in Buyer all rights, title and interest of Seller in and to the Acquired Assets and otherwise in order to carry out the purposes and intent of this Agreement.

12.8 **Bulk Sale Laws**. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar laws and all other similar laws in all applicable jurisdiction with respect to the transfers contemplated by this Agreement.

12.9 **Headings; Construction; Incorporation of Recitals**. The section and paragraph headings throughout this Agreement are for convenience and reference only and the words contained therein shall not be held to expand, modify, or aid in the interpretation, construction or meaning of this Agreement. The gender and number used in this Agreement are used as a reference term only and shall apply with the same effect whether the Parties are of the masculine, corporate or other form, and the singular shall likewise include the plural. All of the Recitals hereof are incorporated by this reference and are made a part hereof as though set forth at length herein.

12.10 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument. The parties may execute this Agreement by original, electronic, or digital signature. The exchange of copies of the signature pages to this Agreement and the Ancillary Agreements, including by email, facsimile, a recognized digital electronic security procedure, or other similar electronic transmission (including an image of a signature), shall constitute effective execution and delivery. Such copies shall be treated in all manner and respects and for all purposes as an original signature and shall be considered to have the same binding legal effect as if they were the original signatures.

12.11 **Notice**. All notices, demands and other communications required or permitted under this Agreement shall be in writing and shall be considered to have been duly given when (i) delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by overnight mail (with receipt requested); or (iii) on the date sent by e-mail (with confirmation of transmission). Such notices must be sent to the respective parties at the following addresses:

If to Seller:

Amerimed Emergency Medical Services LLC
c/o Arthur Dixon Marlow II
4908 Golden Pkwy Ste 100
Buford, GA 30518
Email: dmarlow@amerimed.net

| | |
|---|---|
| With Copy To: | Benjamin Klehr, Esq.<br>Small Herrin, a limited liability partnership<br>100 Galleria Parkway<br>Suite 350<br>Atlanta, GA 30339<br>Email: bklehr@smallherrin.com |
| | and |
| | Charles Kelley, Esq.<br>Kelley Law LLC<br>P.O. Box 2758<br>Gainesville, GA 30503<br>Email: charles@charleskelley.law |
| If to Buyer: | MedEx Medical Transport Service, Inc.<br>c/o Dillon Lowe, Chief Executive Officer<br>902 E. Memorial Drive<br>Ahoskie, NC 27910<br>Email: dillon@medextransport.com |
| With Copy To: | Thomas T. McClendon, Esq.<br>Jones & Walden LLC<br>699 Piedmont Ave NE<br>Atlanta, GA 30308<br>Email: tmcclendon@joneswalden.com |

11.11. **No Third-Party Beneficiaries**. This Agreement is for the sole benefit of the Parties and their respective permitted successors and assigns, and nothing herein, express or implied, shall confer upon any other person any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement, except as may be expressly provided in an order of the Bankruptcy Court.

11.12. **Fiduciary Obligations**. Nothing in this Agreement, or any document related to the transaction contemplated hereby, will require the Seller or any of its directors or officers, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

11.13. **Expenses**. Except as otherwise expressly provided in this Agreement or approved by the Bankruptcy Court, each Party shall bear its own legal, accounting, advisory, diligence, negotiation and other expenses incurred in connection with this Agreement and the transactions contemplated hereby.

11.14. **Assignment**. Buyer may assign its rights under this Agreement to an affiliate of Buyer upon written notice to Seller, provided that Buyer shall remain responsible for its obligations

under this Agreement unless Seller otherwise agrees in writing. Seller may not assign this Agreement.

(Signatures on following page)

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

"BUYER"
MEDEX MEDICAL TRANSPORT SERVICE, INC.
a North Carolina corporation

By: *Dillon Lowe*
Name: Dillon Lowe
Title: Chief Executive Officer

"SELLER"
AMERIMED EMERGENCY MEDICAL SERVICES LLC, as debtor and debtor in possession

By: ______________________
Name: Arthur Dixon Marlow II
Title: Chief Executive Officer

**JOINDER**

Arthur Dixon Marlow II joins in this Agreement solely to acknowledge that he shall execute and deliver at Closing the restrictive covenant agreement contemplated by this Agreement.

By: ______________________
Arthur Dixon Marlow II, individually



CamScanner

**Exhibit "A"**

**Telephone Number Assets**

[telephone numbers to be completed]: all local, toll-free, facsimile, and mobile telephone numbers used, published, or marketed by Seller.

Exhibit B

**Assumed Contracts and Leases**

1. Traumasoft Contract.
2. Oracle NetSuite Contract (to the extent assignable).
3. Headquarters Lease with Datamaha, LLC for 4908 Golden Parkway, Suite 100, Buford, GA 30518, with a term through November 30, 2027 (subject to Buyer's right to remove it on or before the sale hearing).
4. Customer and referral source contracts: [customer and referral contracts to be completed].

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERIMED EMERGENCY MEDICAL SERVICES LLC, | ) | Case No. 26-20894-jrs |
| | ) | |
| Debtor. | ) | |

# CERTIFICATE OF SERVICE

I, Benjamin S. Klehr, certify that I am over the age of 18 and that on this date I filed and served copies of the foregoing NOTICE OF FILING OF ASSET PURCHASE AGREEMENT, by using the Bankruptcy Court's Electronic Case Filing program which sends a notice of the above-listed documents and an accompanying links to the documents to the parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program listed on Exhibit A.

Dated: November 25, 2026

**SMALL HERRIN, LLP**
*Counsel for Debtor and Debtor-in-Possession*

By: /s/ Benjamin S. Klehr
Benjamin S. Klehr
GA Bar No. 487931

100 Galleria Parkway
Suite 350
Atlanta, GA 30339
(T): 770-783-1800
bklehr@smallherrin.com

**EXHIBIT "A"**

***By CM/ECF –***

Jonathan S. Adams on behalf of Creditor Internal Revenue Serivce
jonathan.adams@usdoj.gov, CaseView.ECF@usdoj.gov;jessica.gordon@usdoj.gov

Christopher P Berney on behalf of Creditor Bridgecap Equities, LLC
cberney@rfllplaw.com
Christopher P Berney on behalf of Creditor Bridgecap Financial, LLC
cberney@rfllplaw.com

David A. Blansky on behalf of Creditor Integrated Vehicle Leasing Inc.
dblansky@moritthock.com, jthompson@moritthock.com

Lydia J. Chastain
lchastain@leemeierburke.com

Shawn M. Christianson on behalf of Creditor Oracle America, Inc.
schristianson@buchalter.com, cmcintire@buchalter.com

Andrew D. Gleason on behalf of Creditor Ford Motor Credit Company LLC
agleason@lrglaw.com

Gwendolyn J. Godfrey on behalf of Creditor M & K Capital LLC
ggodfrey@polsinelli.com, vpreciado@polsinelli.com;ATLDocketing@Polsinelli.com

Anna Mari Humnicky on behalf of Debtor Amerimed Emergency Medical Services LLC
ahumnicky@smallherrin.com, klemons@smallherrin.com;edesimone@smallherrin.com

Charles N. Kelley, Jr on behalf of Debtor Amerimed Emergency Medical Services LLC
charles@charleskelley.law,
tammy@charleskelley.law;Kelley.CharlesB154518@notify.bestcase.com

Charles N. Kelley, Jr on behalf of Plaintiff Amerimed Emergency Medical Services LLC
charles@charleskelley.law,
tammy@charleskelley.law;Kelley.CharlesB154518@notify.bestcase.com

Benjamin S. Klehr on behalf of Debtor Amerimed Emergency Medical Services LLC
bklehr@smallherrin.com, klemons@smallherrin.com;kweindorf@smallherrin.com

Benjamin S. Klehr on behalf of Plaintiff Amerimed Emergency Medical Services LLC
bklehr@smallherrin.com, klemons@smallherrin.com;kweindorf@smallherrin.com

Jeffrey Kurtzman on behalf of Creditor Keystone Quality Transport

kurtzman@kurtzmansteady.com

Darryl S. Laddin on behalf of Creditor Integrated Vehicle Leasing Inc.
bkrfilings@agg.com, darryl.laddin@agg.com;deborah.shallcross@agg.com

Adam Lubow on behalf of Creditor Alexander Baum
adam@lubowlaw.com

Adam Lubow on behalf of Creditor Noah Grassie
adam@lubowlaw.com

Adam Lubow on behalf of Creditor Tyquana Jackson
adam@lubowlaw.com

Roy E. Manoll, III on behalf of Creditor Corporate Leasing and Investment Co., Inc.
kdd@fbglaw.com

Roy E. Manoll, III on behalf of Creditor Eschol D. Graham Leasing, LLC
kdd@fbglaw.com

Thomas T. McClendon on behalf of Creditor MedEx Medical Transport Service, Inc.
tmcclendon@joneswalden.com, jwdistribution@joneswalden.com;eterrell@joneswalden.com

Jonathan E. Mills on behalf of Creditor Todd M. Dixon
jon@durdenmillspc.com

G. Frank Nason, IV on behalf of Creditor Hire Healthcare, LLC
fnason@lcenlaw.com,
emiller@lcenlaw.com;emiller_169@ecf.courtdrive.com;fnason@ecf.courtdrive.com

Office of the United States Trustee
ustpregion21.at.ecf@usdoj.gov

Nancy B. Pridgen on behalf of Creditor QuikMedic, LLC
nancy@pridgenbassett.com

John K. Rezac on behalf of Creditor Golddust LLC
jrezac@ardis.law

Dylan Franklin Rogers on behalf of Creditor 3500 Loop Road, LLC
bankruptcy@evict.net

Joseph P. Rusnak on behalf of Creditor Quality Nashville, LLC
jrusnak@tewlawfirm.com, thobbs@tewlawfirm.com

Patrick Nicholas Silloway on behalf of Creditor Internal Revenue Serivce

patrick.silloway@usdoj.gov

Lawrence Dale Turner on behalf of Creditor Prisma Health
ldturner@sehealthlaw.com

David S. Weidenbaum on behalf of U.S. Trustee Office of the United States Trustee
david.s.weidenbaum@usdoj.gov

Daniel L. Wilder on behalf of Creditor Sumitomo Mitsui Finance and Leasing Co. Ltd.
dwilder@goodmanlaw.org, bkydept@goodmanlaw.org;bkydept5@goodmanlaw.org
John J. Wiles, Sr. on behalf of Creditor 3500 Loop Road, LLC
bankruptcy@evict.net, jjwiles@evict.net

Stuart Freeman Wilson-Patton on behalf of Creditor TN Dept of Revenue
agbankgeorgia@ag.tn.gov, Stuart.Wilson-Patton@ag.tn.gov